Messrs. *John C. Park*, of Boston, *James Russell*, of West Cambridge, *Samuel H. Walley, Jr.*, of Roxbury, *Seth J. Thomas*, of Charlestown, *Ensign H. Kellogg*, of Pittsfield, *Lewis Williams*, of Easton, *Alexander Ingham*, of Middlefield.

On the 17th of February, the committee on elections, at the request of their chairman, were discharged from the further consideration of the elections in Bolton, Easthampton, Northborough, Lanesborough, Hawley, and Spencer, and the same were then referred to—

Messrs. *George Wheatland*, of Salem, *William Sawyer*, of Charlestown, *Samuel Greele*, of Boston, *Gamaliel Church*, of Westport, *Dexter Fay*, of Southborough, *Stephen L. White*, of Taunton, *Stephen Bates*, of Charlemont.

## CASE OF THOMAS NASH, JR.

A person, who is not returned as a member, has no right to take a seat and act as such, even though he is duly elected, and ought to have been returned.

An election for the choice of representatives being held at the same time with an election for register of deeds, votes, bearing the names of persons not resident in the town, and with the words " for register of deeds " thereon, if deposited in the box appropriated for the reception of votes for representatives, are not, it seems, to be counted in making up the whole number of votes given in for representative.

On the assembling of the house, at the commencement of the session, in January, 1843, and before the organization, two persons, Thomas Nash, Jr., and Justus White, appeared and drew seats as members, each of them claiming to be elected and entitled to a seat, as the representative from the town of Whately, in the county of Franklin. Neither of them had

any certificate of his election from the selectmen, as required by law; but each of them had in his possession a copy of the record of the meeting, at which the inhabitants of Whately ballotted for representative, and was prepared with affidavits and other evidence to support his claim to a seat. Mr. Nash took and subscribed the oaths of office with the other members, and proceeded to act and vote as such. Mr. White was not qualified, and did not assume to act.

After three ineffectual ballotings for speaker, in which Mr. Nash was supposed to have voted, it was moved and seconded to adopt the following order[1]: —

"Ordered, That Thomas Nash, Jr., claiming a seat in this house as a representative from the town of Whately, be requested to state, whether he voted in the election of speaker, at the last ballot."

It being moved and seconded,[2] that this order lie upon the table, the question was taken on the motion, and it appeared, by the returns of monitors temporarily appointed for the purpose, that there were one hundred and seventy-three votes in the affirmative, including the vote of Mr. Nash, and one hundred and seventy-two in the negative.[3] Before declaring the vote, it was moved and seconded, that the vote of Mr. Nash be disallowed.[4] This motion was debated at great length, and the question thereon being taken by yeas and nays, was decided in the affirmative, by one hundred and seventy-seven yeas to one hundred and seventy-five nays.[5]

The vote was then declared in the negative, and the order was allowed to be withdrawn.[6]

It was thereupon moved and seconded, to adopt an order, declaring that neither of the claimants was entitled to a seat,

---

[1] 65 J. H. 5.          [2] Same, 6.          [3] Same, 7.          [4] Same, 8.

[5] Same, 10. On this question, Mr. Nash, whose name was borne on a list of the qualified members prepared for the purpose by the secretary of the commonwealth, was called and voted in the negative. This was contrary to the rule of parliament, universally acknowledged, that even a member duly returned shall not vote on a question which concerns him personally, but shall withdraw from his seat, and from the house, when the question is stated. No one, however, objected to the vote of Mr. Nash; and the clerk presiding did not feel authorized to omit calling his name, unless by order of the house.

[6] 65 J. H. 11.

and prohibiting both from exercising the functions of members, until their claims could be investigated.

This order was so modified as to relate, separately, to each of the persons named in it, and adopted first as to Mr. White,[1] without a division, in the following terms: —

"Whereas, Justus White is here present, claiming to be a member of this house from the town of Whately, in the county of Franklin, but without the certificate of his election required by law; therefore,

Ordered, That the said White is not entitled to a seat in this house, and that he be prohibited from any of the rights of members therein, until his claim can be investigated by a committee and decided by the house, in the manner heretofore invariably practised in similar cases."

The question was then proposed on the adoption of the order, in the same terms, relating to Mr. Nash, and decided in the affirmative, by one hundred and seventy-seven yeas to one hundred and seventy-four nays.[2] On this occasion, when Mr. Nash's name was called, he did not answer. The house proceeded, on the next day, and completed their organization, by the choice of a speaker.

On the 12th of January, Mr. Nash petitioned the house,[3] representing that, at a meeting of the citizens of Whately, held on the 14th of November preceding, he was duly elected a representative therefrom in the general court; that the selectmen had refused him a certificate of his election, for want of which the house had refused him a seat; and praying the house to inquire into the matter, and if the fact of his election should appear, to allow him to take his seat as a member.

This petition was referred to the committee on elections, who reported thereon[4] as follows: —

"The committee commenced their investigation of the testimony in this case by observing, that, there being no certificate of election from Whately, in the hands of any person, the *prima facie* case is, that no person has been elected a representative from that town, and the full burden of proof to make

---

[1] 65 J. H. 12.    [2] Same, 13.    [3] Same, 32.    [4] Same, 299.

out a case beyond reasonable doubt, is upon any one assuming to claim the seat.

The first evidence, which the committee found in the case, was the record of the town-meeting on the fourteenth of November, which goes directly to confirm the truth of the above *prima facie* case.

The record showed, that Thomas Nash, Jr. had 118 votes; Justus White, 117; Charles Williams, 1; Horace W. Taft, 1; and that it was declared 'no choice,' and that thereupon it was voted not to send.

The committee have, in all their investigations, endeavored to uphold the high and responsible office of selectmen, as it has existed in this commonwealth, and did exist before the constitution. The duty of a clerk is simply to record the acts and doings of the town, as declared by the selectmen.

Still the committee are of opinion, that if any fact is recorded in the town clerk's record, which is declared by any claimant to be untrue, it is lawful for that claimant to introduce evidence to show that his allegation is true.

In pursuance of this ruling, the claimant was permitted to introduce testimony to show facts which would contradict the record. Testimony was therefore introduced tending to show, that persons not entitled to vote voted at that election, and that some who were legal voters were refused a right to vote.

Testimony was further introduced tending to show, that the two scattering votes were thrown for persons not eligible, and that the same ought not to have been counted as ballots.

The committee submit to the house the evidence relative to illegal voting, and merely add their own conclusion, that they see no reason to reject any of the votes which were received. Neither do they find any reason, why the rejected vote was not properly refused; and as to all but one of these votes, the committee were unanimous. Upon that one, which was the vote of Abner Field, the house is respectfully referred to his own testimony. [See the counter report.]

In reference to the scattering votes, the committee observed, that if either of them had been counted, it would have pro-

duced the same result, viz., no choice. The claimant therefore assumed the burden of proof, to show that the vote for Horace W. Taft, and the vote for Charles Williams, were each and both of them for persons not eligible, and therefore ought not to have been counted.

There is positive testimony, that the vote for Taft, was thrown by a person who intended to vote for Justus White as representative, and who afterwards claimed a right to vote for White, and was refused. The committee saw plainly that the vote for Taft was a ballot under the statute, so far that it exhibits the wish of a voter adverse to the claimant, Mr. Nash.

The committee found contradictory testimony relative to the vote for Williams; whether it had or had not on it any writing tending to show that it was for a person ineligible,—and as a doubt remains in the minds of the committee, they are of opinion, that the claimant has not made out his case in this point, the burden of proof being upon him.

Although the committee reject the vote given for Taft, on the ground, that Mr. Wells testifies, that he deposited that vote for 'register of deeds,' and that he subsequently claimed to vote for representative, and was refused, as his name had been checked, when he deposited the ballot for Taft in the representative box; yet they are of the opinion, that the selectmen were bound to count the votes for Taft and Williams, in ascertaining the whole number of ballots; unless they had decided to allow Mr. Wells to rectify his mistake and vote for representative, in which case they should have rejected the vote cast for Taft.

The statute in relation to this matter is so clear, that it cannot be mistaken,—and as the present case is one in which the committee are called upon to set aside the record, upon the ground that the doings of the selectmen were incorrect,—it becomes the duty of the committee and the house to refer to the law, Rev. Stat. c. 4, § 13, which is as follows:—

'In order to determine the result of any election in this commonwealth, the whole number of persons, who voted at

such election, shall first be ascertained, by counting the whole number of separate ballots given in; and no person shall be deemed and declared to be elected, who shall not have received a majority of the whole number of ballots; and in all returns of elections, the whole number of ballots given in shall be distinctly stated; but blank pieces of paper shall not be counted as ballots.'

Again, c. 5, § 7, prescribes 'that the election of representatives shall be recorded in the town records, together with the whole number of votes given in, and the names of all the persons for whom they were given.'

It will be observed that nothing is said as to ineligible candidates, but a vote given for any person is to be recorded.

The practice in congress has been to count all ballots, and even blanks, in determining an election; but a practice has occasionally obtained in this house, in convention, of treating ballots for unconstitutional candidates as blanks. Your committee, however, are not aware that any member was ever returned to this house, or established in his seat here, by the rejection of ballots for ineligible candidates, which would, if counted, have changed the result.

In anticipation of the possibility of such a result, and in consequence of an order having been submitted to the committee on this subject by the house, it becomes important that this question should be brought distinctly before the house for their judgment; inasmuch, as although there are difficulties in the minds of the committee in this case, in consequence of the uncertainty as to the Williams vote, and owing to the vote of the town on the 14th, not to send, which vote might have been rescinded then or on the 28th; yet, after all, another and a very grave question is, will the house allow a person to take or hold a seat as a member, who has not a majority of the ballots cast by legal voters?

May not every legal voter, relying on the thirteenth section of the fourth chapter, say, that 'vote for whom I may, if I vote for any person, my ballot must be counted to determine the whole number of ballots.' And again, where there is

voting going on, at the same time, in three different boxes, may not a voter, by mistake, deposit the wrong ballot in the representative box? And then, though he is punished for his neglect, by failing to have his vote count affirmatively for his favorite candidate, will the house go further, and say that his ballot shall not be counted to ascertain the whole number of ballots? We think not.

The committee desire to present another view of this case, to which we have already alluded in part, which somewhat divests it of any embarrassment upon the subject of this count.

It cannot be doubted, that the selectmen are the competent authority to act and pass upon the votes during the continuance of the town-meeting. The selectmen, exercising their authority, declared to the town that there was no choice. No objection was made at the time to this declaration, and it is not pretended that there was any fraud, connivance, or intentional misconduct, in the selectmen, in this declaration.

The town, if they had seen proper, might have proceeded to another choice at that time; but on the contrary, a motion was immediately made, and deliberately carried, not to send a representative.

It will be observed, that all this took place at the meeting on the second Monday of November; and, by the statute, the town, or any ten voters of the town, might have asked for a meeting on the fourth Monday of the month, and it was not done.

The vote, therefore, 'not to send,' remains; and that deliberate act of the town, being an act within their power, and which they might have reversed, if they had chosen, on the fourth Monday, ought not to be reversed by the legislature, without full and conclusive and satisfactory evidence, that the people had already chosen some one to represent them; and that this result had been announced in the meeting; and therefore, that they had no right to vote not to send. The committee, therefore, recommend the adoption of the following order:—

Ordered, That Thomas Nash, Jr., the petitioner, have leave to withdraw his petition."

A counter report was also presented at the same time, signed by three members of the committee, (Messrs. *Thomas, Russell,* and *Williams,*) as follows :—

" The committee on elections have divided on the case of Thomas Nash, Jr., of Whately, and it becomes necessary for the undersigned to make their report :—

They do not present it as the minority report, but, in fact, as the majority report, in so far as the conclusion is concerned, namely, that Mr. Nash is entitled to a seat in this house. This conclusion they regard as the legitimate deduction from the votes taken in the committee, on the several points raised in the inquiry. No other conclusion can be fairly drawn from those votes, which are to the following effect, and establish, by a majority of the committee, these facts :—

1st. That all the votes given to Thomas Nash, Jr., the claiming member, namely, 118, are legal votes.

2nd. That Noah Dickinson and Asa Belden would have voted for Mr. Nash, if Porter Wells and Calvin Wells had been allowed to vote for Justus White, and that these two on both sides are balanced, and not to be counted either way.

3rd. That the votes of John Brown and Willard Belden, which were duly offered in town-meeting for Thomas Nash, Jr., and rejected by the selectmen, were unlawfully rejected, and ought to have been received and counted for Mr. Nash ; the said Brown and Belden being qualified voters, and having taken all the preliminary steps to entitle them to vote.

4th. That Justus White, the opposing candidate to Mr. Nash, has shown no claim whatever to a seat in this house.

5th. That the vote for Horace W. Taft, of Sunderland, for register of deeds, ought not be counted. On these points the committee are agreed. This would make the whole number of votes 236 : of which Thomas Nash had 118 ; Justus White had 117 ; ' Charles Williams of Deerfield, for register of deeds,' 1. On the exclusion of the vote for Charles Williams,

of Deerfield, for register of deeds, the vote in the committee was 3 to 3, the chairman not being present.

If the Charles Williams vote is excluded, which it ought to be, in the opinion of the undersigned, as well as the vote for Horace W. Taft, then Mr. Nash was elected.

But even if that vote is counted against Mr. Nash, still, as the undersigned view it, Mr. Nash is elected by excluding the vote of Abner Field, who voted against Mr. Nash, and who was not a legal voter. It was proved that Field voted for Justus White, and it was contended, on the part of Mr. Nash, that Field was not a legal voter. On this question the vote in the committee stood 3 to 3, the chairman being absent. But the chairman comes to the same conclusion, as we understand it, and which is in strict conformity to his own decision in the case of Methuen, reported at the last session of the legislature, that Field was not a legal voter, and hence his vote ought to be excluded. This would leave (even counting the Williams vote for register of deeds,) the following result:

| | |
|---|---:|
| Whole number of votes as counted by the selectmen, | 237 |
| Deduct the Horace W. Taft vote, - - - 1 | |
| " Abner Field's illegal vote, - - - 1 | |
| | 2 |
| Would leave, - - - - - - - | 235 |
| Necessary to a choice, - - - - - - | 118 |
| Thomas Nash, Jr., has - - - - - | 118 |
| Justus White 117, less 1 by the illegal vote of | |
| Abner Field, - - - - - - | 116 |
| Charles Williams, for register of deeds, - - | 1 |

Thus, by rejecting the Horace W. Taft vote, and the vote of Abner Field, in which a majority of the committee agree, it is in fact decided that Mr. Nash has a majority of all the legal votes given for representative, and such ought to be the conclusion of the report.

The only ground taken to obviate this conclusion, as we understand it, is, that after the votes were counted, and no

choice declared by the selectmen, the town voted not to send a representative to the general court the present year.

An answer to this is, that such a vote, taken after a ballot, cannot invalidate a choice, if any person had received, previous to such vote, a majority of the legal ballots for representative.

Any other conclusion would put it in the power of a minority, who should happen to remain in town-meeting, after the result of a ballot that showed a majority for a candidate, to set it aside by declaring no choice, and voting not to send.

An election, made after a vote not to send, is void, but a vote not to send cannot invalidate an election already made by a majority of the legal votes given for a representative.

This point was settled as early as 1787, in the case of the town of Paxton, (*ante*, 20,) and has never since been questioned in any decision. In that case the selectmen refused to give Hezekiah Ward a certificate of election, alleging that a meeting was held in that town for choice of representative, which was very thinly attended, at which it was voted to send a representative, and Mr. Ward was elected; that the said meeting was adjourned, and at the adjournment thereof, when a much larger number of the inhabitants was present, it was voted to reconsider the vote passed at the previous meeting; that Mr. Ward was present at said adjourned meeting, and was also informed of the reconsideration by one of the selectmen, but nevertheless claimed his seat.

Upon this state of facts, the petitioners had leave to withdraw, and Mr. Ward held his seat.

If, therefore, Mr. Nash had a majority of the votes cast for representative in the town of Whately, on the first ballot, no subsequent act of the town could deprive him of his seat.

The same point is settled in Mr. Fuller's case, in the town of Holland, (*ante*, 366). The town voted to send a representative, and a ballot was had. The selectmen declared no choice. Several other ballots were had without a choice; and then the town voted to reconsider the vote to send, and the meeting was dissolved. Mr. Fuller claimed his seat on the ground that he was chosen on the first ballot. The committee on elections

were satisfied that he did have such majority, and reported accordingly.

The chairman of the present committee on elections was also chairman of the committee in Mr. Fuller's case, and though he dissented from the report in his favor on another ground, viz.: that Mr. Fuller had obtained votes by the promise of a treat given to the voters, in the nature of a bribe, yet he " concurred with the majority in reference to all the facts stated in their report," and did not rely on the votes of reconsideration and not to send, as affecting the balloting which had previously been had.

On these grounds, the undersigned think they have a right to put it to the house, that the only fair deduction, from the votes of a majority of the committee, on the several points raised in the case of Mr. Nash, is, that he was duly chosen a member of this house, and is entitled to his seat. But the undersigned go further, and maintain that the votes for register of deeds should not be counted, and that upon the face of the record, as well as all the facts in the case, Mr. Nash was duly chosen a member of this house.

The question as first presented upon the record was solely whether two votes, given for ineligible persons, should be counted. But in the investigation before the committee, the petitioners alleged that four votes had been illegally received for Mr. Nash, and two votes for Mr. White rejected. On the part of Mr. Nash, it was contended that four legal votes had been rejected that were offered for him, and that one illegal vote had been received for Mr. White. The proof satisfied the committee, that all the votes for Mr. Nash were legal, and that two more votes for Mr. Nash than for Mr. White were rejected that ought to have been received.

The only fact in the case on which the committee differ is, whether Abner Field, who voted for White, was a resident in Whately.

The following is a copy of the entire record of the meeting for choice of representative and for register of deeds, on the

14th day of November in the town of Whately. The whole record should be taken together, that the intent of the voters may be fairly understood.

### COPY OF RECORD.

' The following is a copy of the votes cast in the town of Whately, for representative to the general court, Nov. 14th, 1842.

For representatives to general court,—whole number of votes, two hundred and thirty seven.

For Thomas Nash, Jr., one hundred and eighteen.

" Justus White, one hundred and seventeen.

" Horace W. Taft, one.

" Charles Williams, one,—declared,—no choice.

Voted not to send a representative to the general court the present year.'

The following is a copy of the warrant and the doings of a meeting held in the town of Whately, Nov. 14, 1842, for the choice of a register of deeds for the county of Franklin.

' Franklin, ss.   To Samuel B. White, constable of the town of Whately, greeting: In the name of the commonwealth of Massachusetts, you are required to notify and warn the inhabitants of the town of Whately, qualified to vote in elections, to meet at the meeting-house near the centre of said town, on Monday, the fourteenth day of November, inst., at one o'clock, P. M., to act on the following articles, viz :

Art. 1st. To choose a moderator.

Art. 2d. To bring in their votes for a register of deeds for the county of Franklin.

And you are directed to serve this warrant, by posting up attested copies thereof, at each of the public meeting-houses in said town, eight days at least before the time of holding said meeting.

Hereof fail not, and make due return of this warrant with your doings thereon to the town clerk, at the time and place of meeting aforesaid.

Given under our hands, this third day of November, in

the year of our Lord, one thousand eight hundred and forty-two.

> PLYNA GRAVES,
> SETH BARDWELL,
> RODOLPHUS SANDERSON,
> > Selectmen of Whately.

*Franklin, ss.  Whately, Nov. 5th, 1842.*

I have served this warrant by this day posting up attested copies of the same in each of the public meeting-houses in said town, eight days before the time for holding said meeting.

> SAMUEL B. WHITE,
> > Constable of Whately.'

' At a legal meeting of the inhabitants of the town of Whately, qualified to vote in elections, held according to the foregoing warrant, Nov. 14, 1842, the following votes were given in, viz. :—

For register of deeds, Charles Williams had eighty-five.
    "    "    "    Horace W. Taft, " seventy-six.
    "    "    "    Waitstill Hastings " twenty-seven.
    "    "    "    Almond Brainard " three.

Voted to dissolve the meeting.  A true copy of record,
    Attest,        SAMUEL LESURE, Town Clerk.'

The facts here disclosed are, that Horace W. Taft and Charles Williams were voted for, for register of deeds, at the same meeting at which a representative was voted for, and that, excluding the two votes for ineligible persons, given for register of deeds, and not for representative, Mr. Nash had a majority of the legal votes of all voting for representative.

The committee agree in all the points raised in Mr. Nash's case, except two, viz. :

1st. Whether the two register votes ought to be excluded, which would elect Mr. Nash.

2d. Whether Abner Feld was an illegal voter, and his vote should be excluded, which would also elect Mr. Nash.

On the first point, the undersigned rely on the practice, almost uniformly recognized by the house, of not counting votes

for persons ineligible to the office for which the votes appear to be cast.

This rule has been recently recognized and applied by the common council of the city of Boston, by a vote of thirty-one to eight, to the exclusion of three democratic members returned from ward one, in that city. In that case, three votes cast for persons not resident in ward number one, and therefore ineligible, were excluded from the count, although the ballots bore no designation but the names of the persons voted for. We refer to this case because it was decided, upon the opinion of a distinguished legal gentleman, Hon. John Pickering, the city solicitor; who was consulted by the common council, and founded his opinion entirely upon the course of proceedings and the precedents established by the legislature of Massachusetts. In that opinion he says:—

'The same word, the word *inhabitant*, being used by the constitution, in describing this qualification of the representatives of towns, and by the city charter, in describing the same qualification of the representatives of the wards of the city, the precedents (from elections in the house) are entitled to the highest consideration; and, in the absence of decisions to the contrary, in cases of municipal elections, they appear to be decisive authorities for the conclusion, that any votes given for a person as representative of a ward, when it is ascertained that he was not an inhabitant of said ward, would be deemed in law to have been erroneously given, and ought not to be counted by the common council, when that body should be called upon to exercise its right of judging upon the election of its members.' The Whately case is much stronger than this. The votes for Taft and Williams were not only given for persons not resident in the town, and therefore ineligible, but they bore on their face the intent of the voters, not to cast them against any candidate for representative. On both votes were the name of the town, and 'for register of deeds.'

The two pieces of paper read thus, 'Horace W. Taft, for register of deeds;' 'Charles Williams, of Deerfield, for register of deeds.' This is proved by the depositions of the three se-

lectmen, who testify to the word ' Deerfield,' on the Williams vote, and by the deposition of Josiah Allis, who testifies to the words, ' for register of deeds.'

Let us then apply the test of the intent of the voters, which ought to govern.

Did Mr. Nash receive a majority of the legal voters, voting for representative ?

This is the test which the supreme judicial court have applied in the case of *Elisha Strong*, *Petitioner*, 17 Pick. 493. They there say :—' All the votes should be counted for the persons for whom they were intended, whether designated by residence or other addition, or not.' ' The only object should be to ascertain the expressed will of a majority of the electors. If the evidence is such as to produce reasonable conviction of the will of the electors, expressed by their ballots, it should be allowed to have its legitimate effect.'

This is all we ask in the case of Mr. Nash. Again, applying the test of common sense, is it possible to suppose that in the town of Whately, where all the voters must be known to each other, two voters would each deposit a vote for a non-resident known to all to be a non-resident, with the name of another town on the vote, and the words ' for register of deeds,' with the intent to have those votes count for a representative from the town of Whately, especially when a box was open at the same time, for votes for register of deeds ?

In this view of the case, it is not necessary for the house to decide, whether votes for ineligible persons, aside from the intent of the voter, ought to be counted or not. They have only to decide whether votes plainly not given for a representative, but for another officer, ought to be counted, contrary to the obvious will of the electors, who cast them against neither candidate for representative, and with no intent to defeat the election.

The committee all agree, that the vote for Horace W. Taft should not be counted, because the voter who cast that ballot testified, that he intended it for register of deeds. The person who deposited the vote for Charles Williams, for register of

deeds, has not been produced, and is not known. Is not his intent as clearly shown by the designation on his ballot, as if he also had testified, that he did not intend that vote for a representative from the town of Whately?

The same reasoning that excludes the first, founded on the intent of the voter, must apply to the last, and therefore, both stand on the same ground, and both ought to be excluded, and Mr. Nash is entitled to his seat.

The second and only other ground of difference in the committee is as to the legality of the vote of Abner Field. Even granting what our colleagues on the committee assume, viz.: that the Charles Williams vote should be counted against Mr. Nash, still, if the vote of Mr. Field for White was an illegal vote, Mr. Nash is elected.

The deposition of Mr. Field is conclusive on the question of residence. He testified, that he had resided with his father in Hatfield for eight years, and held a farm there; that he came to Whately on the 29th of March, 1842, to work as a hired man, for seven months, for Charles Russell; that he intended to return to Hatfield at the expiration of the term for which he had let himself; that he used to return home to his father's on Sundays, as often as once in two weeks, as a general thing; that he considered it his home at Mr. Russell's during the first part of his stay there; if he had been sick, he should probably have been carried to his father's, and during this time he intended to return to Hatfield at the expiration of his time; in July, he had an opportunity of hiring a farm in Whately, and letting his farm in Hatfield, which was the cause of his changing his mind about returning to Hatfield; about the 25th of July, 1842, he determined to take the farm in Whately, and become a resident there; that before the 25th of July he continued to intend to return to Hatfield at the end of the seven months; that he hired the farm in Whately on the condition that if the owner sold it, he was to give it up, and he let his farm in Hatfield, on the condition that the occupant was to give it up, if he wished to return. The owner of the farm in Whately had given him

notice that the farm was sold, and the purchaser was about moving into the house. He expected to return to Hatfield when he left that farm. On the 13th of October, 1842, he was published in Hatfield to be married, and took his certificate from the town clerk of Hatfield, and was not published in Whately. He adds, that on the day of the election (November 14th) he had resided in Whately with the intention of remaining there, from the 25th of July last.

Applying to this state of facts the law of residence, as settled by the supreme judicial court, in the cases of *Thorndike* v. *Boston*, 1 Met. 242, and *Sears* v. *Boston*, ib. 256, and as construed uniformly by the house, in all cases of contested residence, the intent must fix the period of a change of residence. In Abner Field's case, he did not change his fixed residence in Hatfield, but was a legal voter there until the 25th of July, 1842, less than six months before the election. It may even be doubted whether he changed his residence then, as his residence in Whately depended upon the contingency of the farm he hired being sold.

His obtaining his own publication in Hatfield, on the 13th of October, which the law requires shall be taken out in the town where a man dwells, brings his intention down to a month within the time of casting his vote.

The consideration of this whole case is thus narrowed down to two single points, which are presented for the judgment of the house, namely:—

1. Ought the vote for Charles Williams, for register of deeds, to be counted against Mr. Nash, as a vote for representative?

2. Ought the vote of Abner Field to be counted as a legal vote?

If either of these questions is settled in the negative, Mr. Nash is entitled to his seat. We think that both should be so settled. We then, also, have two legal votes that would have been given for Mr. Nash, (namely, Brown and Willard Belden) wrongfully excluded by the selectmen, against which there is no offset; and, in the whole view of the matter, if the

design is to give effect to the declared will of the electors, ' under the guidance of good practical sense,' we see not how the house can refuse to recognize Mr. Nash as legally chosen a member by a majority of all the legal voters voting for representative, or claiming the right to vote.

We therefore recommend the adoption of the following order: Ordered, That Thomas Nash, Jr., is entitled to his seat in this house."

The report was first amended by substituting, for the conclusion thereof, the conclusion of the counter report, and then accepted; and it was accordingly—

Ordered, That Thomas Nash, Jr., is entitled to his seat in this house.[1]